**UNITED STATES of America, Plaintiff,**

v.

**Fanny VARON–PEREZ, Defendant.**

**No. 96–342–CR.**

United States District Court,
S.D. Florida,
Miami Division.

June 13, 1997.

Christopher R.J. Pace, Jonathan Loo, Asst. U.S. Attys., Miami, FL, for plaintiff.

Philip R. Horowitz, Miami, FL, for defendant.

*SENTENCING OPINION*

ROETTGER, District Judge.

This heroin smuggling case by a "mule" is typical of so many drug courier cases that come through our Miami division. However, it has enough different facets to it that a sentencing opinion seems appropriate. Ms. Varon–Perez is 48 years old, has two children and resides in Colombia. Her 92–year–old mother resides with her although she has four siblings in Colombia.

As is typical in these cases, there is very little evidence of her past activities and there never seems to be any evidence of prior criminal conduct because most, if not all, of their lives have been spent in a foreign country. Consequently, the probation officer and the judge are nearly always dependent upon

what information can be gleaned from the U.S. Customs search—nearly always at Miami International Airport—and defendant's own story as given to the probation officer which is predictably exculpatory or a litany of extenuating circumstances.

Ms. Varon–Perez entered the United States via an American Airlines flight from Bogota, Colombia. She was very nervous during the questioning by Customs' agents and there is no question as to the legality of the border search. Although there was no proffer of evidence in this particular case, past proffers have indicated that Customs' agents have an almost uncanny sense of when to send such new arrivals to the hospital for x-rays on the suspicion that they are carrying drugs in pellets; these pellets were, as they usually are, heroin-filled condoms which are swallowed by the drug courier before leaving the source country, often Colombia. Of course, the agents may well fail to detect such couriers, but the persons they send for x-rays almost invariably are "body carriers" or internal carriers.

The Customs' agent's suspicions about Ms. Varon–Perez were justified: Defendant was carrying 553 grams—1.35 pounds—of heroin in 79 pellets which she passed in a period of five days after arrival at the hospital.

A computer records check of either Customs or the Immigration and Naturalization Service revealed that Ms. Varon–Perez had made five entries into the United States prior to this one in the last 18 months. She explained she had been here on buying trips; she has been selling clothes, custom jewelry and perfumes for a living since 1980.

Having so many trips to the United States in a brief period raises a suspicion that she has been a lucky drug courier who escaped detection by U.S. Customs before. On the other hand, a judge in South Florida could easily take judicial notice of the fact that there is a widespread industry from Latin American countries comprising persons who come to Miami with large empty suitcases or luggage, fill them with clothing and various other items and transport them back to Latin America for resale. This judge has seen dozens of such scenes in Miami International Airport or in the hotels in downtown Miami which seem to be, naturally enough, packing centers for the luggage.[1]

Of course, there is no evidence as to whether Ms. Varon–Perez was making legal trips in her alleged business of buying and selling clothing and other items or whether the purpose of the trips into the United States was illegal and she had previously escaped detection. And there is also the likely possibility she brought drugs into the United States and carried out items bought here for resale, thereby making money coming and going. However, the court is unable to make a finding as to the nature of Defendant's prior trips to the United States.

At sentencing, Defendant objected to the probation officer's failure to give a four-level reduction for her role in the offense, claiming she should receive a "minimal" role credit under Section 3B1.2 of the United States Sentencing Guidelines Manual (1995). In the alternative, Defendant sought to be declared a "minor" participant in the offense to receive a two-level reduction under Section 3B1.2. Defendant's objections were overruled.

### CONCLUSIONS OF LAW

The United States Sentencing Guidelines Manual § 3B1.2 (1995) provides for downward adjustments of a defendant's offense level to reflect his or her limited role in a particular criminal activity. This provision, titled "Mitigating Role," allows for a four-point decrease for defendants who were minimal participants or a two-point decrease for defendants who were minor participants. The Application Notes to Section 3B1.2 define "minimal" as the least culpable category reserved for defendants who are "plainly among the least culpable of those involved in the conduct of a group." The Application Notes explain that the downward adjustment for a minimal participant should be used infrequently. "Minor" is defined as more

1. It is such a common occurrence that this judge has no trouble taking judicial notice of the exis-

tence of this business.

culpable than minimal, but "less culpable than most other participants." According to the Background Note, the determination of whether a defendant is a "minimal" or a "minor" participant is heavily dependent upon the facts of the particular case. *See United States v. Smith,* 918 F.2d 1551, 1556–56 (11th Cir.1990) (emphasis supplied).

■ The conduct of all necessary participants in the criminal activity is relevant in making the determination about whether this provision of the Sentencing Guidelines applies. *United States v. Costales,* 5 F.3d 480, 484 (11th Cir.1993). A court must find that the "relevant conduct" for which a defendant would otherwise be accountable involved more than one participant. *Id.* A court must also find that a defendant's culpability for such conduct paled in comparison to that of other participants. *Id.* at 485. Section 3B1.2 was inapplicable in *Costales* since only one "participant" was criminally responsible in receiving child pornography through the mail. *Id.* at 484–85.

In this case, Defendant based her request for a downward adjustment on the fact that she was merely a drug courier who did not know the drugs were heroin. However, the Eleventh Circuit, relying on *United States v. Buenrostro,* 868 F.2d 135, 138 (5th Cir.1989), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990), has held that role reduction turns upon culpability, not courier status. *Smith,* 918 F.2d at 1566. A defendant courier may be just as culpable as other participants. *Id.* The Eleventh Circuit has recently reiterated that courier status alone does not necessarily constitute a mitigating role. *United States v. Veloza,* 83 F.3d 380, 381 (11th Cir.1996). The court held that "a courier who carried drugs into the U.S. does not alone establish that he was a minor participant in the conspiracy." *Veloza,* 83 F.3d at 381.

The defendant relies upon *United States v. De Ramirez,* Case Number 92–0295–CR–ATKINS (S.D.Fla. September 30, 1992) as a similar case involving a "mule" in which the district court accorded the defendant a four-level decrease as a minimal participant. However, the instant case is factually distinguishable. The "mule" in *De Ramirez* agreed to act as a drug courier and was taken to a hotel the night before her flight. There, the men who organized the drug importation ring gave De Ramirez several heroin-filled pellets to swallow, but she was unable to do so. The men then gave her sedatives and muscle relaxants. They later returned in the middle of the night, administered more sedatives and muscle relaxants, and inserted the pellets into her rectum. The men stated that they would kill anyone who tried to double-cross them by not delivering the drugs to Miami. De Ramirez eventually passed 14 packets containing a total of 98.7 grams of heroin. The court found that De Ramirez was the least culpable of those involved because the men in Colombia had procured the heroin, recruited the defendant, purchased her ticket, administered sedatives and muscle relaxants to defendant, and inserted the packets inside her. The actions of these men were "in stark contrast" to those of De Ramirez who "merely submitted to the medication and insertion, and acted as a one-time courier for the importation of a small amount of drugs."

The facts in the instant case do not paint such a sympathetic picture. The Defendant swallowed—by her own hand—79 separate pellets which took her five days to pass and amounted to 553 grams of heroin, a quantity five-and-a-half times larger than that imported by the defendant in *De Ramirez.* The fact that Ms. Varon–Perez ingested a large amount of heroin defeats her attempt to be defined as a minimal participant under the guidelines.

The Application Notes to Section 3B1.2 indicate that a courier might qualify as a minimal participant if he or she had been "recruited as a courier for a *single* smuggling transaction involving a *small* amount of drugs" (emphasis added). Her 1.35–pound payload was not a "small" amount of heroin. Despite Defendant's self-serving version of the facts, the large amount of heroin compounded with the frequency of her trips to the United States make it highly unlikely that she had been recruited for a lone smuggling transaction.

Unlike the defendant in *De Ramirez*, Ms. Varon–Perez was not coerced into swallowing heroin pellets by a group of threatening men. Ms. Varon–Perez was voluntarily working with a man she met in December of 1995 through her clothing and perfume business. Defendant met "Richard" on numerous occasions. He asked her if she had a U.S. visa and wanted to make money by carrying pellets internally into the United States. Because of her allegedly strained finances and his "insistence," she agreed to carry the drugs. She was introduced to another person in the scheme, a woman named "Edirma," who met her at a hotel, gave her pellets to ingest, told her what to wear, and instructed her about what to do when she reached Miami. Defendant participated in the scheme on her own volition after deliberating about it for a few weeks.

Of the three known players in this operation, Defendant's role was undoubtedly the most daring. Defendant was a frequent, sophisticated traveler to the United States. She willingly swallowed a large amount of contraband and daringly carried it into this country in order to profit $4,500.00. She committed a serious crime with serious consequences for the public. Under the circumstances, this Court cannot find Defendant lacked culpability or was merely a minor participant in the importation ring.

As the Fifth Circuit has explained:

[C]ouriers are an indispensable part of drug dealing networks. Without somebody to take the drugs across the border, the drugs will never reach their illicit market. In addition, the mere fact that a defendant was apprehended while acting as a courier does not imply that the defendant is only a courier. The district judge need not accept the defendant's self-serving account of his role in the drug organization. Finally, even if the defendant were purely a courier having no knowledge of the other aspects of the drug dealing operation, the defendant might nonetheless be a highly culpable participant in the operation. A courier who willingly undertakes illegal transit without asking many questions is especially valuable to a criminal organization. When police apprehended a studiously ignorant courier, the organization can rest comfortably, knowing that its other operations remain hidden from the law.

*Buenrostro*, 868 F.2d at 138. Without the courier, the scheme is inoperable; the deal fails. *Id.* The Seventh Circuit has also described couriers as "integral to the success of drug rings." *United States v. Burnett*, 66 F.3d 137, 140 (7th Cir.1995). When couriers are held accountable for the drug amounts they carry, they play a significant rather than a minor role in those offenses. *Id.* "Henchmen and factotums therefore do not receive automatic reductions." *Id.*

■■ Defendant bore the burden of establishing the appropriateness of a reduction in her offense level by a preponderance of the evidence. *Id.* at 141; *United States v. Gates*, 967 F.2d 497, 501 (11th Cir.1992), *cert. denied sub nom, Burley v. United States*, 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). Defendant simply could not demonstrate that she significantly lacked culpability. She knowingly and willingly transported a large quantity of drugs into this country while participating in a drug importation ring. She is not entitled to a reduction simply because of her status as a drug courier. *United States v. Cacho*, 951 F.2d 308, 310 (11th Cir.1992). The Sentencing Commission could easily have established a special downward adjustment for all mere mules. *Buenrostro*, 868 F.2d at 138. It did not choose to do so. Rather, the Sentencing Commission cautioned that Section 3B1.2 should be infrequently applied. *Cacho*, 951 F.2d at 309.

To say that Defendant's role was minimal or minor would downplay the necessity of her participation in the importation ring and would reward her for playing a critical role in completing the offense. For the reasons set forth above, Defendant's request for a downward adjustment in her sentence because she was merely a courier or "mule" and, therefore, had only a minimal or minor role in the importation of heroin into the United States, was **DENIED**. The Court has entered judgment sentencing Defendant to a 46–month

term of imprisonment to be followed by a three-year term of supervised release.